Filed 11/10/21  In re D.H. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re D.H., a Person Coming Under the Juvenile Court Law. | D078915 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>J.D.,<br><br>        Defendant and Appellant. | (Super. Ct. No. J519523) |

APPEAL from orders of the Superior Court of San Diego County, Rohanee Zapanta and Yvonne Esperanza Campos, Judges.  Affirmed.

Christine E. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

J.D. (Mother) appeals orders issued in the Welfare and Institutions Code section 300[1] dependency proceedings for her 17-year-old child, D.H. In September 2017, the juvenile court declared D.H. to be a dependent of the juvenile court. In February 2019, Mother's reunification services were terminated and the court ordered that D.H. continue in foster care at the San Pasqual Academy (SPA). Although D.H. had been assigned the female gender at birth, he had been experiencing gender dysphoria for years and identifying as male, and sought gender affirming therapy in the form of testosterone treatment.[2] In his application for court authorization for such treatment, D.H. stated that both Mother and her counsel had been contacted and disagreed with his request for such therapy. On February 25, 2021, the court approved D.H.'s application and issued an ex parte order authorizing gender affirming hormone therapy for him. At the March 25 initial postpermanency planning review hearing, the court, on the Agency's inquiry, confirmed that it was not changing the February 25 order at that hearing. The court granted the request by Mother's counsel to set the issue of D.H.'s hormone therapy for trial, which it set for May 25, to be heard concurrently with the contested postpermanency planning review hearing. On May 25, Mother filed a section 388 petition seeking, inter alia, modification of the February 25 order authorizing hormone therapy for D.H. At the May 25 hearing, the court summarily denied Mother's section 388 petition and proceeded with the contested postpermanency planning hearing.

---

[1]     All statutory references are to the Welfare and Institutions Code.

[2]     Respecting D.H.'s request, we refer to him using male pronouns.

2

On appeal, Mother contends that the court: (1) violated Mother's constitutional right to due process by issuing the February 25 order ex parte without first providing her with notice and an opportunity to be heard on D.H.'s request for authorization of hormone therapy; (2) violated her constitutional right to due process by requiring her to file a section 388 petition to challenge the court's prior order authorizing D.H.'s hormone therapy; (3) abused its discretion by summarily denying her section 388 petition; (4) lacked jurisdiction to issue its order authorizing D.H.'s hormone therapy; (5) failed to consider D.H.'s best interests in authorizing hormone therapy; and (6) erred in stating at the March 25 hearing that it had no authority to change the February 25 order. For the reasons discussed below, we affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

D.H. was born in January 2004 and was assigned the female gender at birth. In May 2017, D.H. was a passenger in a car driven erratically by Mother as she attempted to flee from police. Mother ran three stop signs and a traffic light before pulling over. After pulling over, Mother struggled with the police officer and resisted arrest. D.H., then 13 years old, told officers that he had been living in the car with Mother since he was five years old. The car was unsanitary and had a strong foul odor. Mother was arrested and D.H. was taken into protective custody.

In May 2017, the San Diego County Health and Human Services Agency (Agency) filed a section 300, subdivision (b) dependency petition alleging that D.H. had suffered, or was at substantial risk of suffering, serious physical harm or illness as a result of Mother's failure to adequately protect D.H. and her failure to provide D.H. with adequate food, clothing, shelter, or medical treatment. In the Agency's detention report, the social

3

worker stated that Mother described herself as a "traveler" and reported that D.H. bathed and urinated in their vehicle. Mother initially spoke to the social worker in an American accent but later spoke in a British accent. The court detained D.H. in out-of-home care.

In late June, D.H. was detained at SPA. At the September contested jurisdiction and disposition hearing, the court found the petition's allegations true, declared D.H. to be a dependent of the court, and removed him from Mother's custody. The court also found that T.H. (Father) was D.H.'s biological father and entered a judgment of his parentage without objection from Mother. The court ordered reunification services for Mother, but not Father, who was incarcerated at that time. Both parents were allowed supervised visitation with D.H. In October, Mother submitted a letter to the court stating that she was in the process of establishing a ministry program and that she and her ministry did not support medical-based therapy and instead preferred natural herbal medicine and biblical remedies. In November, a court-appointed special advocate (CASA) was appointed for D.H. and the court gave the CASA authority to make all decisions pertaining to D.H.'s education.

During the reunification period, Mother participated in biweekly therapy. Mother's therapist diagnosed her as suffering from a major depressive disorder, other psychotic disorder, stimulant use disorder, and an unspecified personality disorder. During a visit with Mother, D.H. told her that he did not want to return to her care. D.H. often ended his visits with Mother early because she made him angry, did not listen to him, and made false statements. D.H.'s CASA reported that D.H. did not want to return to Mother's care, fearing that doing so would jeopardize his health, happiness, and safety. D.H. enjoyed his placement at SPA. In its 12-month review

4

hearing report, the Agency stated that D.H. had begun to question his gender identity and had asked to be referred to as male. When D.H. informed Mother of his preference to identify as male, Mother told him that he was not allowed to become male. The court continued the 12-month review hearing and set the matter to be heard as a combined 12-month and 18-month review hearing.

In its 18-month review hearing report, the Agency recommended that Mother's reunification services be terminated, noting that she continued to exhibit mental health symptoms and erratic behavior. The Agency believed that Mother did not have the ability or resources to meet D.H.'s needs. Mother's therapist reported that Mother continued to deny the protective issues and had poor awareness regarding her mental health and the world, generally. The Agency also reported that D.H. openly identified as male and was in the process of transitioning from female to male. He participated in biweekly therapy with a TERM therapist to explore his gender identity. His therapist reported that D.H. had expressed a desire to possibly undergo medical treatment for gender reassignment in the future. In November 2018, Mother was discharged from therapy due to excessive absences. She was subsequently given a referral for a new therapist, but failed to follow through with that referral and refused treatment. During a December 2018 meeting with an Agency social worker, Mother stated that she disagreed with D.H.'s identification and outward expression as a male because it violated her religious beliefs; she opined that it was merely a phase that D.H. was going through. The Agency recommended that the court forgo setting a section 366.26 hearing because D.H. wished to remain at SPA, he was not a proper subject for adoption, and there were no individuals willing to assume guardianship of him.

5

In February 2019, the court held the combined contested 12-month and 18-month review hearing. The court terminated Mother's reunification services, found that the setting of a section 366.26 hearing was not in D.H.'s best interests, and ordered a permanent plan of continued foster care for him.

During the first postpermanency planning review period, D.H. turned over to SPA staff an unopened pack of cough and cold pills and admitted having stolen it during an outing. He denied regular substance abuse and agreed to attend a substance abuse educational program. D.H. reported that he was openly transgender and was transitioning from female to male. In April, in lieu of individual TERM therapy, he began participating in weekly individual and group therapy at SPA that addressed gender identity, trauma, substance abuse, and other topics. During an April child and family team (CFT) meeting, Mother voiced her disagreement when D.H. discussed his gender identity. D.H. subsequently refused to attend one visit with her and terminated another visit early, explaining that Mother "trigger[ed]" him and caused him anxiety. At the July review hearing, the court confirmed its prior selection of long-term foster care as D.H.'s permanent plan.

In her report during the second review period, the CASA stated that D.H. was interested in hormone therapy and obtaining an elastic breast band and had expressed discomfort living in an all-girls dormitory. Also, D.H. did not want to see Mother again. During a January 2020 CFT meeting, Mother asserted that D.H. was a female and Mother had to be redirected several times to address D.H. with male pronouns. In the courthouse lobby before the January review hearing, Mother stated her belief, in D.H.'s presence, that his exploration of his gender identity was a byproduct of adolescence and that he was being adversely influenced by persons around him. D.H. left the lobby in order to terminate the interaction. At the review hearing, the court

6

granted Mother's request for new court-appointed counsel and directed the Agency to inquire with SPA about allowing D.H. to live in a male dormitory.

In March, D.H.'s counsel filed a section 388 petition, asking the court to modify its September 2017 order that granted Mother supervised visits by issuing a new order prohibiting contact between Mother and D.H. The court found that D.H. had made a prima facie showing on his petition and set a contested hearing on it. At the July 2020 contested hearing on D.H.'s petition, the court granted the petition and issued a no-contact order that protected D.H. from any communication from, or contact by, Mother, finding that contact with Mother was detrimental to D.H.'s health and well-being.

D.H. participated in weekly therapy at Rady Children's Hospital and learned more about the gender transition process. His CASA reported that he continued to express interest in hormone therapy to effect his transition from female to male. At the September postpermanency planning review hearing, the court confirmed its prior orders, including D.H.'s placement at SPA with a permanent plan of long-term foster care and the no-contact order between Mother and him.

On February 23, 2021, D.H. filed an application for an order for medical treatment, requesting authorization for gender affirming hormone therapy (i.e., testosterone treatment). David Inwards-Breland, M.D., D.H.'s physician at the Rady Children's Hospital Center for Gender Affirming Care, signed that portion of the application setting forth D.H.'s diagnosis of gender dysphoria and his need for gender affirming hormone therapy (i.e., testosterone treatment). Dr. Inwards-Breland explained the consequences to D.H. of not providing him with that treatment as follows:

> "Patient experiences gender dysphoria—severe distress
> related to the presence of breast tissue, pitch of his voice
> and lack of traditionally masculine secondary sex

7

characteristics, which he experiences to be incongruent with his gender identity, resulting in depressed mood, anxiety, extreme social discomfort, and hopelessness. Without treatment, there is a high likelihood that symptoms will persist and worsen."

Attached to the application was a letter from H. Bixby Marino-Kibbea, the director of the Rady Children's Hospital Center for Gender Affirming Care, who had completed psychosocial assessments of D.H. in November 2019, January 2020, and January 2021. Marino-Kibbea reported that D.H. had started his social transition six years earlier and had a strong identity as a boy, and found that he experienced significant distress related to the pitch of his voice, lack of typically masculine secondary sex characteristics, and presence of breast tissue, which resulted in his depressed mood, anxiety, and extreme social discomfort. Marino-Kibbea stated that D.H.'s psychiatric symptoms appeared to be reasonably well-managed at that time and that D.H. had reported having a strong support system, including friends, his social worker, and SPA staff. Marino-Kibbea opined that gender affirming hormone therapy (i.e., testosterone treatment) was medically necessary to alleviate the distress that D.H. experienced related to gender dysphoria, which was detrimental to his mental health.

Also attached to D.H.'s application was a six-page informed consent form signed by D.H. on February 22. The form described what testosterone treatment is, its benefits and risks, and potential side effects. By signing that form, D.H. confirmed that he had discussed with his doctor the benefits and risks of taking testosterone, the possible or likely consequences of hormone therapy, and alternative treatment options. D.H. also confirmed that he understood the risks of such treatment, had sufficient opportunity to discuss treatment options with his clinician, and had all of his questions

8

answered to his satisfaction. Confirming that he believed he knew enough to give his informed consent for testosterone therapy, D.H. signed the form and also initialed adjacent to the statement: "I want to begin taking testosterone."

The application also showed that Mother, Father, Mother's counsel, Father's counsel, and D.H.'s counsel had been notified of D.H.'s application for an order authorizing gender affirming therapy and that all agreed with it, except for Mother and Mother's counsel, who opposed it.[3] On February 25, the court signed the order ex parte, authorizing gender affirming therapy (i.e., testosterone treatment) for D.H.

At the March 25 initial postpermanency planning review hearing, Mother requested that the court set for trial the issues of D.H.'s return to her care, her objection to hormone therapy for D.H., and the no-contact order. The visiting judge set a contested hearing on those issues for May 25 and confirmed that it would not be changing the prior February 25 order authorizing D.H.'s hormone therapy at the March 25 hearing. On May 5, although she was represented by court-appointed counsel, Mother filed, in pro per, a notice of appeal expressly challenging, inter alia, the March 25 order and implicitly challenging the February 25 order authorizing gender affirming hormone therapy for D.H.[4]

_____

[3]  The application stated that on February 18 Mother was notified of D.H.'s application by telephone and Mother's counsel was notified by e-mail, and that each did not agree with the request for an order authorizing hormone therapy.

[4]  Although Mother's May 5, 2021 notice of appeal did not expressly challenge the February 25, 2021 order, we construe her notice of appeal broadly to include a challenge to that order, which authorized gender affirming hormone therapy for D.H.

On April 30, D.H. attended his first hormone therapy appointment and learned about the process and its potential effects. On May 5, D.H. attended an appointment at which a nurse showed him how to administer testosterone injections. D.H. placed reminders on his phone to ensure that he would not miss a scheduled injection. D.H. had not been meeting with his therapist consistently; the nurse strongly encouraged him to participate in therapy during the gender transition process. The Agency social worker agreed to locate a therapist that specialized or had experience in treating youths who were undergoing that process.

At the May 10 pretrial status conference, Mother's counsel confirmed the May 25 contested hearing. In addition to discussing the contested postpermanency planning review hearing, Mother's counsel stated: "Mother is also asking for an opportunity to be heard regarding her opposition to the hormone therapy. We did indicate opposition to the ex-parte [order], but the court authorized it against Mother's and her counsel's objection. . . . Our planned witnesses would be just some cross-examination of the social worker, and Mother will be testifying. The court replied, "All right."

In its final addendum report for the May 25 hearing, the Agency stated that D.H. had his third testosterone injection on May 19 and had not reported any issues with his treatment. He remained resistant to therapy and had been encouraged to participate in therapy. SPA staff reported concerns that D.H. had started to self-isolate. He requested the COVID-19 vaccine so that he could obtain off-campus employment. Father consented to the vaccination, but Mother objected to it.

On May 25, Mother filed a section 388 petition requesting that the court vacate its order authorizing hormone therapy for D.H. and modify its no-contact order to allow her contact with him, among other requests.

10

Mother's petition alleged that there had been a change in circumstances since the prior orders, including D.H.'s increased isolation, his decreased willingness to participate in therapy, his admitted substance use in December 2020, and Mother's community college coursework. Her petition also alleged that Mother's requested change in the court's orders were in D.H.'s best interest because he appeared to be struggling with his mental health.

At the May 25 hearing, the court initially heard arguments as to whether Mother had made a prima facie showing on her section 388 petition. Mother argued that she had been denied her right to due process because she was not provided with an opportunity to be heard on her objection to hormone therapy for D.H. before the court issued its order authorizing his hormone therapy. The Agency's counsel argued that Mother had an opportunity to request a hearing on D.H.'s hormone therapy, but failed to do so. The Agency, D.H., and Father opposed Mother's section 388 petition.

The court summarily denied Mother's section 388 petition requesting modification of its prior order authorizing hormone therapy for D.H., finding that she had not made a prima facie showing of changed circumstances. The court also summarily denied her section 388 petition as to her requested modifications of other orders.

After denying Mother's section 388 petition, the court proceeded with the contested postpermanency planning hearing on the issues of D.H.'s placement, his request for COVID-19 vaccination, and the educational rights for him. The court admitted in evidence the Agency's reports and the CASA's report. Mother's counsel stated that she had no questions for the Agency's social worker and then called Mother to testify. Mother testified that she opposed vaccination for D.H. because of its dangerous and damaging side

11

effects and her Christian beliefs. The court admitted in evidence various documents offered by Mother, including documents showing her participation in community college courses. The court also stated that it would consider the documents attached to Mother's section 388 petition.

D.H. testified in response to Mother's testimony. He testified that living with Mother had negatively impacted his happiness and mental health. He had resided out of her care for four or five years and had no unsupervised contact with her during that period. He disagreed that he was unhappy at SPA and testified that nearly every person there supported him. He stated that the SPA community was loving and kind and that his placement there gave him a second chance at life. He wanted the COVID-19 vaccine so that he could obtain employment, and had researched its side effects in making his decision.

The court granted D.H.'s request to receive the COVID-19 vaccine and continued his CASA as the sole holder of his educational rights. The court also continued his placement at SPA with a permanent plan of long-term foster care and also continued the no-contact order between Mother and D.H. The court found D.H. to be credible, noting that he consistently articulated his needs in a well-reasoned manner. The court also authorized a follow-up appointment with D.H.'s treating physician regarding hormone therapy and ordered that the Agency assess off-campus therapy for him related to his gender identity and hormone therapy. Mother timely filed a notice of appeal challenging the May 25 order denying her section 388 petition opposing hormone therapy for D.H. and the order denying her request for placement of D.H. in her care.

12

DISCUSSION

I

*Constitutional Right to Due Process*

Mother contends that the February 25, 2021 order authorizing gender affirming hormone therapy for D.H. must be reversed because the juvenile court violated her constitutional right to due process by not providing her with notice and an opportunity to be heard before issuing that order.

A

Section 362, subdivision (a) provides that if a child is adjudged a dependent of the court under section 300, "*the court may make any and all reasonable orders for the care*, supervision, custody, conduct, maintenance, and support *of the child, including medical treatment*, subject to further order of the court." (Italics added.) Similarly, section 369, subdivision (c) provides that if a dependent child is placed in the care and custody of an Agency social worker "and it appears to the court that *there is no parent . . .* capable of authorizing or *willing to authorize medical . . . or other remedial care or treatment for the dependent child, the court may after due notice to the parent . . . order that the social worker may authorize the medical . . . or other remedial care for the dependent child*, by licensed practitioners, as necessary." (Italics added.)

In general, parents and other parties to juvenile dependency cases have the right to procedural due process under the United States Constitution, which requires notice and an opportunity to be heard appropriate to the nature of the case. (*In re Jesusa V.* (2004) 32 Cal.4th 588, 601, citing *Boddie v. Connecticut* (1971) 401 U.S. 371, 377; see also *In re B.G.* (1974) 11 Cal.3d 679, 689; *In re Matthew P.* (1999) 71 Cal.App.4th 841, 849, 851.) " 'A

13

meaningful hearing requires an opportunity to examine evidence and cross-examine witnesses . . . .' " (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 413.) It is fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner. (*Fuentes v. Shevin* (1972) 407 U.S. 67, 80.)

B

Mother argues that the court's failure to provide her with notice and an opportunity to be heard before issuing its February 25, 2021 order violated her constitutional right to due process and that the order must therefore be reversed. However, assuming arguendo that Mother was constitutionally entitled to notice and an opportunity to be heard before the court issued its February 25, 2021 order, we nevertheless conclude that she waived or forfeited her right to be heard by not timely asserting that right after learning of D.H.'s intent to seek the court's authorization for gender affirming therapy or after the court's February 25, 2021 ex parte order granting his application for such authorization.

"An appellate court ordinarily will not consider challenges based on procedural defects or erroneous rulings where an objection could have been but was not made in the trial court. [Citation.] Dependency cases are not exempt from this forfeiture doctrine. [Citations.] The purpose of the forfeiture rule is to encourage parties to bring errors to the attention of the juvenile court so that they may be corrected." (*In re Wilford J.* (2005) 131 Cal.App.4th 742, 754.) "In dependency litigation, nonjurisdictional issues must be the subject of objection or appropriate motions in the juvenile court; otherwise[,] those arguments have been waived [or forfeited] and may not be raised for the first time on appeal. [Citations.]" (*In re Christopher B.* (1996) 43 Cal.App.4th 551, 558.) Parents generally will not be excused from

14

application of this forfeiture doctrine when they had the opportunity to present the error (e.g., defect in notice) to the juvenile court and failed to do so. (*In re Dakota S.* (2000) 85 Cal.App.4th 494, 501.) "This is precisely because defective notice [or other procedural error] and the consequences flowing from it may easily be corrected if promptly raised in the juvenile court. [Citation.]" (*In re Wilford J.*, at p. 754 [concluding that father forfeited contention on appeal that he was denied adequate notice of jurisdictional hearing by appearing at subsequent hearings thereafter without raising that issue and thereby denying juvenile court opportunity to correct that error]; cf. *In re B.G., supra*, 11 Cal.3d at p. 689 [although mother did not receive adequate notice of jurisdictional hearing, she forfeited her right to raise that issue on appeal when she appeared at subsequent hearings and failed to challenge validity of jurisdictional order].) This forfeiture doctrine also applies to constitutional errors. "Points not raised in the trial court will not be considered on appeal. [Citation.] 'Even a constitutional right must be raised at the trial level to preserve the issue on appeal [citation].' [Citation.] In civil cases, constitutional questions not raised in the trial court are considered waived. [Citation.]" (*Hepner v. Franchise Tax Bd.* (1997) 52 Cal.App.4th 1475, 1486.)

Our review of D.H.'s February 23, 2021 application shows that Mother and Mother's counsel were notified of his intent to apply for an order authorizing gender affirming therapy for him. According to D.H.'s application, Mother was notified by telephone on February 18 and Mother's counsel was notified by e-mail on February 18. Mother does not dispute on appeal that she received such notice. D.H.'s application stated that both Mother and Mother's counsel did not agree with his request for authorization

for gender affirming hormone therapy.[5]  Accordingly, even if we were to assume that the notice provided to Mother and Mother's counsel did not comply with Mother's procedural due process right to notice, Mother nevertheless had de facto prior notice of D.H.'s intent to file an application for an order authorizing gender affirming therapy several days before the court entered the order authorizing such treatment; yet Mother failed to file any papers opposing such application or to request a hearing prior to February 25 *and* failed to raise or object to any due process error in the juvenile court promptly after the court issued its February 25 ex parte order approving that application and authorizing gender affirming therapy for D.H.  Further, even if we were to assume that the court deprived Mother of a meaningful opportunity to be heard on D.H.'s application by issuing the February 25 order ex parte without first holding a hearing, Mother also failed to promptly raise or object to that due process error in the juvenile court.

The record shows that Mother and her counsel had seven days' actual prior notice before the court issued its February 25, 2021 ex parte order. Further, the record shows that D.H. did not receive his first testosterone injection until on or after May 5.  Mother and her counsel thus had at least until May 5, 2021, to object to hormone therapy for D.H. and request that the court set a hearing at which the parties would have the opportunity to address the issue of hormone therapy for D.H. before that therapy began.  If Mother or her counsel had timely objected to hormone therapy for D.H. and timely requested a hearing on the issue, the court presumably could have set an evidentiary hearing on the issue of authorization of hormone therapy for

---

[5]     As discussed above, Father, Father's counsel, and D.H.'s counsel all agreed with his request for authorization of hormone therapy.

16

D.H. and afforded Mother a meaningful opportunity to be heard at that hearing prior to the commencement of D.H.'s hormone therapy.

By not timely requesting a hearing regarding hormone therapy for D.H. prior to the commencement of the therapy, Mother waived or forfeited her constitutional right to be heard on the issue before D.H.'s hormone therapy began.

Mother also forfeited her right to be heard regarding hormone therapy for D.H. at the May 25 hearing. Of particular note, Mother waited until the March 25, 2021 initial postpermanency planning hearing to request that the court set for trial the issue of her opposition to hormone therapy for D.H., and she did not object to the court's setting that hearing for May 25, to be heard together with the contested postpermanency planning hearing. At the May 10 pretrial status conference, Mother's counsel confirmed the May 25 contested hearing on the hormone therapy issue, representing that she planned to cross-examine the Agency's social worker and have Mother testify on that issue. However, on May 25, rather than proceeding with the contested hearing on her opposition to hormone therapy for D.H., Mother elected instead to file a section 388 petition requesting modification of the February 25 order. That petition was summarily denied for failure to make a prima facie showing of changed circumstances. Mother's counsel did not raise the issue of hormone therapy outside the context of Mother's section 388 petition, despite the fact that the issue had been set for trial, and did not cross-examine the Agency's social worker or have Mother testify regarding D.H.'s hormone therapy at that hearing.

If Mother had timely objected to the court's ex parte order authorizing D.H.'s hormone therapy and/or timely requested an opportunity to be heard at an evidentiary hearing on that issue *promptly* after that order was

17

entered, the juvenile court presumably could have cured any purported violation of Mother's due process rights by conducting an evidentiary hearing soon thereafter and prior to the commencement of D.H.'s hormone therapy. Further, if Mother had pursued the issue at the May 25 hearing, outside the context of her section 388 petition, as she could have done, she could have been heard on the issue at that time. However, through her dilatory actions and procedural choices below, we conclude that Mother forfeited her right to be heard on the issue of hormone therapy for D.H. in the juvenile court. (*In re Wilford J.*, *supra*, 131 Cal.App.4th at p. 754; *In re Christopher B.*, *supra*, 43 Cal.App.4th at p. 558; *In re Dakota S.*, *supra*, 85 Cal.App.4th at p. 501; *In re B.G.*, *supra*, 11 Cal.3d at p. 689; *Hepner v. Franchise Tax Bd.*, *supra*, 52 Cal.App.4th at p. 1486.).[6]

II

*Mother's Section 388 Petition*

Mother contends that the trial court: (1) violated her constitutional right to due process by requiring her to file a section 388 petition in order to challenge its February 25, 2021 order authorizing hormone therapy for D.H.; and (2) abused its discretion by summarily denying her section 388 petition based on its finding that she had not made the required prima facie showing of changed circumstances since its February 25 order.

---

[6] Because we dispose of this contention on the ground of waiver or forfeiture, we need not, and do not, address the argument by the Agency that because Father, as D.H.'s biological father, consented to gender affirming therapy for D.H., the court could issue an order authorizing hormone therapy for D.H. pursuant to section 369, subdivision (c), as quoted above, regardless of any opposition by Mother.

A

*Procedural background.* On May 25, 2021, Mother filed a section 388 petition requesting, among other things, that the court vacate its order authorizing hormone therapy for D.H. Mother's petition alleged that there had been a change in circumstances since the court's February 25 order, citing D.H.'s increased isolation and his decreased willingness to participate in therapy, as well as the fact that the court had issued its ex parte order without giving her an opportunity to be heard in opposition to D.H.'s application for hormone therapy.[7] In particular, her petition alleged that her requests for changed orders were in D.H.'s best interest because he was isolating and struggling with his mental health and she had been denied her constitutional due process right to be heard regarding hormone therapy.

At the May 25 hearing, the court initially heard arguments as to whether Mother had made a prima facie showing on her section 388 petition. Mother argued that she had been denied her right to due process because she was not given an opportunity to be heard on her objection to hormone therapy

[7] In an attachment to Mother's section 388 petition, she alleged: "Both [Mother] and [Mother's counsel] voiced their opposition upon notification of the ex parte request authorizing gender affirming therapy. [Mother] was informed by the social worker that due to her objection a special hearing would be set to address this issue. A special hearing was never set. The court authorized the therapy despite [Mother's] disagreement and [Mother's counsel's] disagreement being noted on the application for the ex parte order. [Mother] was never given the opportunity to be heard regarding her concerns for [D.H.'s] well-being and her factual disagreements with the information provided in the letter from therapist H. Bixby Marino-Kibbea, LCSW, recommending the treatment. Today's addendum identifies [D.H.] as reporting no close relationships with peers and staff at SPA and as refusing therapy in direct contrast to the letter by the therapist recommending the treatment. The house parent per today's addendum is also expressing concerns about [D.H.'s] well-being and increased isolation."

19

for D.H. before the court issued its order authorizing his hormone therapy. The Agency's counsel argued that Mother had an opportunity to request a hearing on D.H.'s hormone therapy, but failed to request a hearing. The Agency, D.H., and Father opposed Mother's section 388 petition. After hearing arguments of counsel, the court stated:

> "What I noted was that with regard to the hormone . . . therapy request that it be suspended, we are looking at changed circumstances. And when I'm looking at that and also just the additional argument of due process with regard to the ex-parte request, I'm looking at the time that this case has progressed to, the level that it has already progressed to, and also given the time the initial concerns of [Mother's] ability to have appropriate healthy and safe insight as to [D.H.'s] situation and also as to [D.H.'s] health, safety and well-being. And the actual concerns that initially, you know, derived from the original petition does not -- there does not appear to have been . . . any additional evidence to support that [Mother] has addressed those concerns to show the court that there has been some progress on her end to achieve appropriate healthy and safe insight for herself and for her want to make contact with [D.H.] There was noted we did have a hearing for the no-contact order. That was months prior to the request for hormone . . . therapy.

> "[¶] . . . [¶]

> "We'll also note that the argument given that there is . . . potential concern with the risks of [hormone therapy], and all the concerns associated with what is recommended with hormone . . . therapy, those are all medically and professionally assessed.

> "Prior to that during the actual treatment and with today's update, health and medical-wise it does appear that everything is in compliance and being monitored appropriately. I will note the request by [D.H.'s] counsel with regard to a follow-up with a treatment provider. As for the prima facie argument as to the hormone . . .

20

> therapy, there has been no [changed] circumstances to support the want to be able to make a meaningful objection given there has been no additional evidence to provide support of a healthy and safe and appropriate insight from [Mother]."

Accordingly, the court summarily denied Mother's section 388 petition requesting that it vacate its February 25 order authorizing hormone therapy for D.H., finding that Mother had not made a prima facie showing of changed circumstances.

B

*Section 388.* Section 388 allows a parent or other interested person to petition the juvenile court to change, modify, or set aside a previously made dependency order. (§ 388, subd. (a)(1).) The petitioner has the burden to show that there are changed circumstances or new evidence and that the requested change would be in the child's best interests. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*); *In re G.B.* (2014) 227 Cal.App.4th 1147, 1157; *In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.) A section 388 petition must be liberally construed in favor of its sufficiency. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 461.)

The petitioner "need only make a prima facie showing to trigger the right to proceed by way of a full hearing." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310.) However, if the petitioner does not meet that threshold showing, the juvenile court in its discretion may deny a request for a section 388 hearing. "The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) The petition's allegations must be specific regarding the evidence to be presented and must not be conclusory. (*In re Alayah J.* (2017) 9 Cal.App.5th

21

469, 478.)  In deciding whether a prima facie showing has been made, the court may consider the entire factual and procedural history of the case.  (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 616.)

The decision whether to grant or deny a section 388 petition is within the discretion of the juvenile court.  (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1228; *In re Y. M.* (2012) 207 Cal.App.4th 892, 920.)  Likewise, a decision to summarily deny a section 388 petition without an evidentiary hearing is within the juvenile court's discretion.  (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 460; *In re Zachary G.*, *supra*, 77 Cal.App.4th at p. 808.)  Where an appellant has made a prima facie showing in support of his or her section 388 petition, it is an abuse of discretion for the juvenile court to summarily deny an evidentiary hearing on that petition.  (*In re Hirenia C.* (1993) 18 Cal.App.4th 504, 516–517; *In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1413, 1416.)  On appeal, a reviewing court will not disturb a discretionary decision by the juvenile court unless it abuses its discretion by making an arbitrary, capricious, or patently absurd determination.  (*Stephanie M.*, *supra*, 7 Cal.4th at p. 318; *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642.)  The appellant has the burden on appeal to affirmatively show that the juvenile court abused its discretion.  (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.)

C

Mother argues that the juvenile court violated her constitutional right to due process by requiring her to file a section 388 petition in order to challenge its authorization of hormone therapy for D.H.  However, the premise of Mother's argument is unsupported by the record.  Our review of the record shows that the court did *not*, at any time either prior to or during the May 25, 2021 hearing, rule or otherwise state that Mother's sole recourse for challenging its February 25 order authorizing D.H.'s hormone therapy

was to file a section 388 petition. First, at the March 25 initial postpermanency planning hearing, Mother requested that the court set for trial the issue of her objection to hormone therapy for D.H., *which the court agreed to do*. Mother did not object to the court's setting of that hearing for May 25, to be heard together with the contested postpermanency planning hearing. At the May 10 pretrial status conference, Mother's counsel confirmed the May 25 contested hearing on the hormone therapy issue, representing that she planned to cross-examine the Agency's social worker and have Mother testify as to that issue.

However, on May 25, rather than proceeding with the contested hearing on her opposition to hormone therapy for D.H., Mother filed a section 388 petition requesting modification of the February 25 order. Contrary to Mother's assertion, her filing of a section 388 petition was *not* the result of any ruling or other statement by the court at or prior to the May 25 hearing. Instead, the reporter's transcript from the May 25 hearing reveals Mother's reasoning for her filing of a section 388 petition rather than pursuing an evidentiary hearing on her opposition to D.H.'s hormone therapy. At the outset of that hearing, the Agency's counsel stated: "With respect to proceeding, the Agency is prepared to move forward. We did, in the meet and confer, discuss whether or not a [section] 388 [petition] was necessary for some of Mother's requests. It is my position that a [section] 388 [petition] is necessary. I would like to address [the issue of a] prima facie [showing] with respect to the no-contact order, the testosterone treatment, and the football [participation authorization]." Mother's counsel stated: "[N]o one raised any issue about a [section] 388 [petition] being necessary until a response to my email on Friday which outlined the same issues that we had mentioned at every prior hearing. [¶] So *in an abundance of caution*, I did file a [section]

23

388 [petition] that is authored by me. . . . I apologize for the lateness; but as I've indicated, *I wasn't aware that* [D.H.'s] *counsel and the Agency was raising this objection until Friday*." (Italics added.) Mother's counsel continued: "I'm hoping the court has the [section] 388 [petition] I authored. That would be the one I would be asking to go forward on today, if it is required in the court's opinion." The court then confirmed that it had a copy of the section 388 petition filed by Mother's counsel.[8]

The court proceeded to hear arguments from counsel on the section 388 petition filed by Mother's counsel on her behalf. D.H.'s counsel expressed her opinion that a section 388 petition was necessary for Mother to address the issue of his hormone therapy because the court had issued a prior order authorizing hormone therapy. Father's counsel agreed with D.H.'s counsel that a section 388 petition was necessary for Mother to address D.H.'s hormone therapy. The court then heard arguments by Mother's counsel regarding whether her section 388 petition had made a prima facie showing of changed circumstances and that the requested modification was in D.H.'s best interest. In particular, Mother's counsel argued that Mother had a right to be heard initially when the court considered D.H.'s ex parte application for authorization for hormone therapy and expected that a special hearing would be set to consider her opposition to it. She also argued that Mother objected to the denial of her constitutional right to due process and, in particular, not being given an opportunity to be heard with regard to hormone therapy for D.H. and stated that Mother was asking for that in her section 388 petition.

---

8    Mother's counsel instructed the court and the other parties' counsel to disregard the separate section 388 petition filed directly by Mother the previous day.

24

In response to Mother's due process argument, the Agency's counsel argued that all parties had been notified of Mother's opposition to hormone therapy for D.H., but the ex parte order was nevertheless issued and a special hearing on hormone therapy was never set. The Agency's counsel argued: "[I]f [Mother] wanted to have her day in court and object to that, she had that ability. So to bring it up now, it's a court order and Mother needs to meet the prongs of [section] 388 in order to meet that." Father's counsel joined in the arguments of the Agency's counsel.

After hearing arguments of counsel, the court addressed the question of whether Mother had made a prima facie showing in support of her section 388 petition. The court found that Mother had not made a prima facie showing of changed circumstances since the prior order authorizing hormone therapy for D.H. Importantly, the court did *not* at any point during the hearing on Mother's section 388 petition make an express or implicit ruling or otherwise state or indicate that Mother's sole means of challenging, or otherwise being heard on the issue of, hormone therapy for D.H. was to file a section 388 petition. Likewise, the court never suggested that its ruling on the section 388 petition precluded Mother from raising the hormone therapy issue at the May 25 hearing when the court considered the merits of the postpermanency planning hearing. Instead, the record shows that although Mother had previously made clear her intention to challenge the hormone therapy authorization at the postpermanency planning hearing, she proceeded with that hearing after the court had denied her section 388 petition, and never raised, or attempted to raise, her objections to hormone therapy for D.H. As a result, Mother forfeited her claim that the court violated her constitutional right to a hearing on that issue. Rather, the record shows that Mother's counsel filed her section 388 petition because she

25

anticipated that counsel for the Agency, D.H., and/or Father would object to any other method by which Mother might seek to be heard on the issue of D.H.'s hormone therapy (e.g., a contested hearing). Mother's tactical choice to file a section 388 petition "in an abundance of caution," as Mother's counsel explained, because of the possibility of an objection by opposing counsel to alternative tactics does not equate with a ruling by the court. Accordingly, we reject Mother's argument that the court required her to challenge D.H.'s hormone therapy solely by means of filing a section 388 petition, and thereby violated her constitutional right to due process.

D

Mother also argues that the court nevertheless abused its discretion by summarily denying her section 388 petition because she made prima facie showings of changed circumstances and that D.H.'s best interests required that the court hold a full evidentiary hearing on her petition. In support of the allegations in her section 388 petition, Mother attached D.H.'s February 23, 2021 application for authorization for gender affirming hormone therapy, the February 25 order authorizing that therapy, documentation regarding Mother's contact with, or attempts to contact, the Agency social worker assigned to D.H.'s case, and the March 25 order. Based on our review of those documents, we conclude that Mother failed to make a prima facie showing of changed circumstances or new evidence in support of her section 388 petition. First, the documentation regarding Mother's contact with, or attempts to contact, the Agency social worker had no bearing on D.H.'s hormone therapy and, in particular, did not include any information as to the risks and benefits or other factors pertaining to hormone therapy for D.H. Second, neither D.H.'s February 23 application with its attachments nor the court's February 25 order authorizing hormone therapy showed any change

26

in circumstances or new evidence since the court's February 25 order. Rather, that information existed prior to or at the time of the February 25 order. That documentation did not show any change in circumstances or new evidence *after* February 25. Third, the March 25 order did not show any change in circumstances or new evidence since the February 25 order. Rather, it simply showed that Mother continued to oppose hormone therapy for D.H. (as she had before the February 25 order) and requested an evidentiary hearing on that issue to be held on May 25. Finally, although Mother's section 388 petition asserted that three Agency reports were attached, the record on appeal shows that those reports were not in fact attached to her petition and therefore could not, and did not, provide any support for the allegations in her petition.[9] In any event, even if we were to consider those three Agency reports, we would conclude that none of them provided support for her allegations that there were changed circumstances or new evidence since the February 25 order. Although those reports show that D.H. was experiencing increased isolation and decreased willingness to participate in therapy, there is nothing in Mother's petition that would support a reasonable inference that those issues were in any way caused by D.H.'s hormone therapy.[10]

---

[9] Mother's petition identifies those three reports as ones dated March 25, 2021, May 10, 2021, and May 25, 2021. However, those reports were not, in fact, attached to her petition.

[10] To the extent the Agency's reports discuss D.H.'s December 2020 use of prohibited substances, that factor preceded his February 23, 2021 application and the court's February 25 order and therefore cannot show changed circumstances. In addition, it appears that the parties were aware of that information at the time of the February 25 order and therefore, it was not new evidence. In any event, there is nothing in the record indicating that use

27

Because Mother elected to proceed by way of a section 388 petition and failed to carry her burden to make a prima facie showing of changed circumstances or new evidence since the prior February 25, 2021 order, the juvenile court properly could, and did, exercise its discretion to summarily deny her section 388 petition based on that deficiency alone. Nevertheless, we further conclude that Mother also failed to make a prima facie showing that her proposed order vacating the February 25 order authorizing hormone therapy for D.H. would be in his best interests. In particular, although D.H. appeared to be struggling with his mental health since February 25, as evidenced by his increased isolation and decreased willingness to participate in therapy, Mother did not present any evidence to support her allegation, and instead merely speculates that termination of D.H.'s hormone therapy would improve those issues. Further, to the extent that Mother's petition alleged that she was denied her constitutional right to due process at the time of the February 25 order, that assertion does not support a reasonable inference that vacating the court's authorization of hormone therapy for D.H. would be in his best interests. Finally, contrary to Mother's assertion, the court's consideration of any change in Mother's circumstances did not show that the court failed to consider, and properly weigh, evidence regarding the change in D.H.'s circumstances as alleged in Mother's section 388 petition. Absent affirmative evidence showing otherwise, we presume that the court was aware of applicable law and properly applied it in summarily denying her petition. (Evid. Code, § 664 [presumption that official duty has been regularly performed]; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th

---

of prohibited substances by D.H. was a continuing problem at the time of the February 25 order.

335, 398 (*Bryant*) [trial court is presumed to have been aware of and followed applicable law]; *People v. Stowell* (2003) 31 Cal.4th 1107, 1114 (*Stowell*) [same]; *Jameson v. Desta* (2018) 5 Cal.5th 594, 609 (*Jameson*) [in absence of contrary showing in record, all presumptions on appeal are made in favor of trial court's action]; *Wilson v. Sunshine Meat & Liquor Co.* (1983) 34 Cal.3d 554, 563 (*Wilson*) [on appeal "it is presumed that the [trial] court followed the law"]; *Multani v. Witkin & Neal* (2013) 215 Cal.App.4th 1428, 1457 (*Multani*) [appellant has burden to affirmatively show error]; *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 (*Arceneaux*) [judgment or order is presumed to be correct on appeal and all intendments and presumptions are indulged in favor of its correctness].) Also, the court's discussion of Mother's circumstances appeared to primarily relate to a separate modification requested in her section 388 petition, i.e., modification of the prior no-contact order, and not her request to vacate the February 25, 2021 order authorizing hormone therapy. Accordingly, we conclude that the court did not abuse its discretion by summarily denying Mother's section 388 petition. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 318; *In re Angel B.*, *supra*, 97 Cal.App.4th at p. 460; *In re Zachary G.*, *supra*, 77 Cal.App.4th at p. 808.) To the extent that Mother cites evidence or inferences therefrom that would have supported a contrary finding by the juvenile court, she misconstrues and/or misapplies the applicable standard of review.

## III

### *Jurisdiction to Issue Order Authorizing Hormone Therapy*

Mother contends that the February 25, 2021 order authorizing gender affirming hormone therapy for D.H. must be reversed because the court lacked jurisdiction to issue that order. We disagree.

29

As discussed above, section 362, subdivision (a) provides that the juvenile court "*may make any and all reasonable orders for the care*" of a dependent child "*including medical treatment . . . .*"  (Italics added.) Likewise, section 369, subdivision (c) provides that if there is no parent willing to authorize medical or other remedial care or treatment for a dependent child, "*the court may, after due notice to the parent . . . order that the social worker may authorize the medical . . . or other remedial care for the dependent child*, by licensed practitioners, as necessary."  (Italics added.) Mother does not assert, nor could she reasonably assert, that the gender affirming hormone therapy (i.e., testosterone treatment) authorized by the court for D.H. is not "medical treatment" within the meaning of section 362, subdivision (a) or section 369, subdivision (c).  Rather, she asserts that section 369, subdivision (c) precluded the court from authorizing D.H.'s hormone therapy over her objection.  In so doing, she misconstrues the plain language of that statute.  Section 369, subdivision (c) expressly authorizes a juvenile court to authorize or order medical treatment when there is a parent *unwilling* to authorize it.  Therefore, contrary to Mother's argument, her objection to D.H.'s hormone therapy did not divest the court of its jurisdiction to authorize that therapy.  Likewise, to the extent that Mother notes that the court signed D.H.'s testosterone treatment consent form on a line intended for parents or guardians, she fails to show that any such technical error divested the court of its jurisdiction to authorize such treatment or undermined the validity of its authorization, such that reversal of the February 25 order is required.

Mother also argues that there was no evidence showing the circumstances at the time D.H. signed his application and accompanying consent form or that he understood the information contained in that form

30

(e.g., the risks, benefits, and consequences of testosterone treatment). However, absent affirmative evidence showing otherwise, the court could reasonably find that D.H. had read the entire consent form, had an opportunity to discuss it with, and ask questions of, his treatment providers, and had an adequate understanding of the risks, benefits, and consequences of testosterone treatment at the time he signed the consent form indicating that he wished to proceed with that treatment.[11] In addition, contrary to Mother's apparent assertion, the court was not required to independently contact, and discuss with, D.H.'s treatment providers the risks, benefits, and consequences of the testosterone treatment proposed for D.H. before it could authorize that treatment and/or sign the consent form.[12] Mother does not cite any authority in support of that assertion. Further, as discussed above, two health professionals opined that D.H. suffered from gender dysphoria and that he likely would continue to so suffer unless he received testosterone treatment.

---

[11] We discuss D.H.'s signature on the consent form simply to refute Mother's argument that he did not understand the information in the form. In so doing, we do not intend to imply that a juvenile, such as D.H., generally has the legal capacity or authority to consent to such medical treatment.

[12] The language in D.H.'s consent form indicating that the signator to the form confirmed that "[m]y doctor has talked with me about [the risks, benefits, and consequences of testosterone treatment]," understood the risks involved, and "had enough opportunity to discuss treatment options with my clinician," is clearly directed toward the patient (i.e., D.H.) who signs that consent form. By signing that form, the court was not making the same representations as D.H. made, nor was it required to do so in order to authorize testosterone treatment for D.H.

31

# IV

## *D.H.'s Best Interests*

Mother contends that the February 25, 2021 order must be reversed because the court failed to consider D.H.'s best interests in authorizing hormone therapy for him and that there is insufficient evidence to support a finding that such therapy was in his best interests. We disagree.

Citing certain factors listed in *In re Phillip B.* (1979) 92 Cal.App.3d 796 that a court should consider in authorizing medical treatment for a *nondependent* child, Mother argues that the juvenile court should have considered those factors in deciding whether to authorize medical treatment for the *dependent* child in this case (i.e., D.H.). In particular, citing *In re Phillip B.*, Mother argues that the court should have considered the seriousness of the harm that D.H. was suffering or the substantial likelihood that he would suffer serious harm, any recommendations by health professionals in support of or advising against such treatment, the risks involved in medically treating D.H., D.H.'s expressed preferences, and, ultimately, whether the medical treatment was in D.H.'s best interests. (See *In re Phillip B.*, at p. 802.) However, Mother merely speculates that the court did not consider each of those factors. Absent affirmative evidence showing otherwise, we presume that the court was aware of, and properly considered, all relevant factors in determining whether to authorize hormone therapy for D.H. (Evid. Code, § 664; *Bryant, supra,* 60 Cal.4th at p. 398; *Stowell, supra,* 31 Cal.4th at p. 1114; *Jameson, supra,* 5 Cal.5th at p. 609; *Wilson, supra,* 34 Cal.3d at p. 563; *Multani, supra,* 215 Cal.App.4th at p. 1457; *Arceneaux, supra,* 51 Cal.3d at p. 1133.) Mother has not carried her burden on appeal to show that the court did not consider all relevant factors before issuing its February 25, 2021 order authorizing D.H.'s hormone therapy. Further, to the

extent that Mother argues that there is insufficient evidence to support a finding that hormone therapy was in D.H.'s best interests, she misconstrues and/or misapplies the substantial evidence standard of review. In applying that standard of review, we consider the evidence, and make all reasonable inferences therefrom favorably to support the court's order, and disregard contrary evidence. (*In re S.B.* (2008) 164 Cal.App.4th 289, 297–298.) By primarily citing evidence and inferences therefrom in favor of her position opposing hormone therapy for D.H., Mother misapplies the substantial evidence standard of review and fails to carry her burden on appeal to show that there is not substantial evidence supporting the February 25 order.

V

*March 25 Order*

Mother contends that the March 25, 2021 order at the initial post-permanency planning hearing must be reversed because the court erroneously believed that it had no authority to change the February 25 order authorizing hormone therapy for D.H.

A

At the March 25, 2021 hearing, Mother requested that the visiting judge (San Diego County Superior Court Judge Yvonne E. Campos) set for trial, inter alia, the issue of her opposition to hormone therapy for D.H. The court set a contested hearing on that and other issues for May 25. The Agency's counsel then represented to the court that the Agency intended to proceed with D.H.'s hormone therapy, which had been authorized by the court in its February 25 order, and requested the court's confirmation that it was not changing that prior order. In response, the court stated: "I am not here as a co-judicial officer to Judge Zapanta to change any prior orders. I understand you all may relitigate that in front of her at the next contested

33

hearing [i.e., at the May 25 hearing]. But for today's purposes, I am not making or changing that order."

B

Mother argues that the record shows that at the March 25 hearing, the court misunderstood its authority under section 385 to change a prior order and, as a result, the March 25 order must be reversed. In so arguing, Mother correctly notes that a juvenile court has broad authority under section 385 to change prior orders. (See, e.g., *In re J.P.* (2020) 55 Cal.App.5th 229, 241, 243.) Section 385 provides: "Any order made by the court in the case of any person subject to its jurisdiction may at any time be changed, modified, or set aside, as the judge deems meet and proper, subject to such procedural requirements as are imposed by this article." However, Mother incorrectly interprets the record as showing that the court misunderstood its authority under section 385 or otherwise to change a prior order. Although the court stated at the March 25 hearing that it was "not here as a co-judicial officer to Judge Zapanta to change any prior orders," that statement, contrary to Mother's assertion, did not indicate that the court was unaware of its discretion under section 385. Rather, our review of the record supports a conclusion that the court presumably was aware of its section 385 authority, but nevertheless exercised its discretion in the circumstances of this case to not change the February 25 order, particularly in light of the fact that it had set a May 25 date for an evidentiary hearing on the issue of hormone therapy for D.H., among other issues. (Evid. Code, § 664; *Bryant, supra,* 60 Cal.4th at p. 398; *Stowell, supra,* 31 Cal.4th at p. 1114; *Jameson, supra,* 5 Cal.4th at p. 609; *Wilson, supra,* 34 Cal.3d at p. 563; *Multani, supra,* 215 Cal.App.4th at p. 1457; *Arceneaux, supra,* 51 Cal.3d at p. 1133.)

Further, as the Agency notes, the record does not show that Mother requested at the March 25 hearing that the court change or vacate the February 25 order. Instead, Mother requested an evidentiary hearing on the issue of D.H.'s hormone therapy and accepted the court's setting of that hearing on May 25. Mother does not cite any language in the reporter's transcript for the March 25 hearing that shows that she requested that the court change or vacate the February 25 order. Absent any such request, Mother cannot reasonably argue on appeal that the court erred by not changing or vacating that prior order at the March 25 hearing. Accordingly, Mother has not carried her burden on appeal to show that the court erred at the March 25 hearing or that its March 25 order must be reversed as a result.

## DISPOSITION

The orders are affirmed.

AARON, J.

WE CONCUR:

HALLER, Acting P. J.

DO, J.

35